[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceeding
On April 20, 1990, after nearly two years of continuous foster placement, Mary Ann F., just turned seven, became the subject of this petition by which the Department of Children and Youth Services (DCYS) seeks to terminate the parental rights of her divorced parents, Susan and Frank F., alleging, as to the mother, all of the nonconsensual grounds for such action as set forth in subsection (b) of Section 17-43a of the Conn. Gen. Stats. (Rev. 1989) applicable to children previously committed to DCYS as neglected or uncared-for, and as to the father, all of such grounds except for abandonment.[1] In a pretrial conference soon after the May 17, 1990 initial hearing on this petition, Susan indicated her willingness to consent to the termination of her parental rights, but only if those of Frank would also be terminated. Frank agreed he would consider a voluntary termination of his parental rights, but only if he could be assured of a continuing right to visit the child. Notwithstanding a recent Supreme Court holding[2] suggesting that even adoption does not necessarily preclude the ability of a biological parent whose rights have been terminated — indeed, the ability of any stranger — to seek visitation under the provisions of Sec. 46b-59[3], DCYS was unable to guarantee that visitation would continue. Since neither parent had, as of that date, executed a written consent on the form required by subsection (a) of Sec. 17-43a, the matter was deemed fully contested, and a trial date of September 10, 1991 (later advanced to August 13, 1990) was set. Prior to trial, on motion of the petitioner, a court-ordered psychiatric evaluation of father and daughter was conducted by Dr. Richard Sadler.
On August 13, 1990, after presenting several witnesses, the petitioner was unable to conclude presentation of its case CT Page 747 because of its failure to have completed the written report mandated by subsection (e)(1) of Sec. 45-61f, incorporated by reference into Sec. 17-43a, subsection (b). As a consequence, trial was continued to September 13, 1990. Four days after the initial trial date, however, counsel for Frank filed a motion to withdraw because of a breakdown in the attorney-client relationship. On September 13, 1990, the motion was granted, new counsel appeared for Frank and, with the agreement of all parties the matter was continued for two months in order to (1) schedule a full day for retrial of the entire case, and (2) for the respondent father to secure an independent evaluation to assist in his defense with funds previously granted by the court for this purpose on an earlier motion of his original attorney.
Retrial began November 5, 1990 and was continued to December 3, 1990 for further testimony of clinical witnesses, only one of whom — the child's therapist called by the petitioner — appeared. At the conclusion of the petitioner's case, all parties rested, the father offering no testimony of his own or of any clinical witness called on his behalf. All parties were given to January 4, 1991 for the filing of trial memoranda, later extended at the request of Frank's counsel to January 11, 1991.
Prior to the date for filing memoranda, Susan appeared before the court on January 3, 1991 and submitted her written consent, filed pursuant to subsection (a) of Sec. 17-43a, to the termination of her parental rights. After a thorough canvass, the court found her consent to be given voluntarily, knowingly and executed with the advice of counsel, with full awareness of its legal consequences. The petitioner thereupon, by oral motion, amended its petition as to the mother only, adding consent as an additional ground for the termination of her parental rights.
Facts
Evidence offered in two days of trial interpreted in the light of the prior record in this court concerning this child and her parents, supports the finding of the following facts:
Susan F. was herself committed to DCYS at the age of 18 months on her mother's allegations of sexual abuse by her father. Later in her various placements as a foster child, she reported being sexually abused in foster homes and by her own retarded brother. She suffered multiple placements and was hospitalized psychiatrically for two months when 14 years old, and again at age 16. She was married to Frank F., whom she met at Cedarcrest Hospital where both were being treated for mental CT Page 748 illness, for over seven years. Their first child, Lisa, born July 25 1981, was placed at birth and with the consent of both parents was adopted in 1982. May Ann was born the following year, on March 31, 1983, and except for two brief foster placements in 1986, lived continuously with her mother until July 14, 1988. Her parents were divorced early in her childhood, Susan receiving custody.
Referrals to DCYS began in 1985 when Susan sought help in controlling the behavior of her then two-year old daughter. Despite the involvement of EDIT, the Visiting Nurses, Project First Step, and Hartford Hospital, by January of 1986 their combined recommendation was for court intervention. DCYS did not initiate a action until June 10, 1986 after Mary Ann had been in foster care for two months. That petition was dismissed on July 17, 1986 on motion of Susan's counsel for failure to serve the respondents. DCYS did not reinitiate court intervention for another two years.
On July 14, 1988 Mary Ann was placed under an Order of Temporary Custody (OTC) based on allegations, supported by accompanying affidavits from qualified professionals, that Mary Ann had been repeatedly sexually abused while in her mother's custody, most recently by Susan's current live-in boyfriend, and that the mother was incapable of providing the child with adequate protection. Frank's whereabouts being then unknown, he was served by publication, but appeared with counsel at a further hearing on September 1, 1988. At that time, Susan indicated her willingness to release Mary Ann for adoption, as they had Lisa, but Frank disagreed, expressing then a desire to make a plan to care for the child himself, notwithstanding his long history of psychiatric hospitalizations. A psychiatric evaluation was ordered on motion of DCYS to include Frank, the child and their interaction. Frank failed to keep his appointment with the psychiatrist, and at the time of a subsequent pretrial conference on October 26, 1988, both parents indicated they would consent to the termination of their parental rights so that Mary Ann could be adopted as her older sister had been six years earlier. DCYS then announced its intention to withdraw the pending neglect petition and substitute coterminously-filed petitions pursuant to the provisions of subsection (c) of Sec. 17-43a. When DCYS had not done so by November 10, 1988, a trial date on the original petition was set for December 19, 1988. On that date, however, instead of proceeding with trial, DCYS again announced its intent to file coterminous petitions and to avoid duplication of testimony, requested that the trial be continued. By agreement of both parties, this was done. Again DCYS did nothing to implement this plan, and the court set a final trial date of January 17, 1989 on the original neglect petition which CT Page 749 had then been pending for six months. On that date, with agreement of both parents, (each represented by separate counsel the court found Mary Ann to be uncared for in the sense of being both homeless and possessing of specialized needs that could not be met in the home of either parent. She was committed to DCYS pursuant to subsection (d) of Sec.46b-129 for an initial period of 18 months. On the date of commitment, Frank failed to appear although represented by counsel. The court spelled out expectations for the mother to achieve to facilitate reunification with the child. These included weekly visits and participation in counselling, both individual and whenever invited to participate in Mary Ann's counselling.
Soon after commitment, however, Susan stopped visiting, having decided against reunification and again expressing her willingness to consent to termination of her parental rights, if Frank would also consent, so that their daughter would be free for adoption. On August 4, 1989, at the time of the next treatment plan prepared by DCYS semi-annually, as required by Sec. 4-E of the Social Security Act, Frank was visiting regularly and had just been permitted unsupervised visits for the first time since commitment. While the placement goal of the treatment plan was "a permanent, safe, nurturing and structured home environment within one (1) year", DCYS did not indicate whether that goal was to be achieved by placement with Frank or, after termination, in adoption. In view of the fact that Frank had never asked for placement of the child with him and was at the time living in a shelter wholly supported by Supplemental Social Security for mental disability, the prospects for placement with him appeared remote, yet DCYS did not then articulate the intention to seek termination and permanency through adoption.
A month after having been given permission to visit without supervision, Frank stopped visiting. He did not ask to see his child from July 23, 1989 until Thanksgiving, and another three months elapsed before he arranged to see her again in February of 1990. He called the foster home and promised a visit and a gift for her seventh birthday to take place on April 1, 1990, but he failed to appear, call, or send the gift. Only after initiation of this action to terminate his parental rights did he resume visitation. He was permitted to arrange his visits directly with the foster family, and while no restrictions were placed on the frequency of visits until October of 1990, he only saw the child eight times in the five months after the filing of the petition, having scheduled four additional visits for which he failed to appear. The only reason given to the DCYS worker for his failure to maintain contact with Mary Ann was "Sometimes he had car trouble" CT Page 750 (testimony of Social Worker Meldrum, November 5, 1990), but he had never requested assistance with transportation. At no time since the child's placement out of her mother's home in July of 1988 has Frank ever offered a plan for her care, stating to the social worker that he realized that he could not take care of her himself. (Ibid.)
Six months later, Frank attended an administrative review of the next semi-annual treatment plan held February 8, 1990. By this time, since Frank had only visited once in the preceding six months while Susan continued to voice her willingness to consent to Mary Ann's adoption, DCYS announced its intention to seek termination of parental rights. Frank informed the social worker at the administrative review that now he, too, was again willing to sign a voluntary consent to termination of parental rights.
DCYS waited another two months, and when neither parent had executed their written consent to termination of parental rights, this petition was filed along with a petition seeking to extend the original commitment beyond its original expiration date of July 9, 1991. While pleading nonconsensual grounds for termination of their parental rights, the social worker testified she fully expected both parents to consent until the initial hearing on this petition, May 17, 1990, when they entered pro forma pleas contesting the allegations and the relief sought.
The child's therapist, Marilyn Fithian, testified that after two and a half years as a foster child, Mary Ann needs the assurance of a permanent home. Even if the foster family, whom she identifies as her parents, cannot adopt, she is fully aware of the difference between foster and adopted children and seeks the permanency of adoption. According to Fithian, continuation of her foster care status any longer would only be harmful: "She needed this a year ago." (Testimony of December 3, 1990). Observing Frank with Mary Ann on one occasion in October of 1990, Fithian concluded that while contact with him is not harmful to the child, neither is it beneficial to her. When Fithian asked the child if she wanted more visits with her father, she had responded "If he brought food, okay," but without bringing food, "no." While there was no antipathy toward her father, Mary Ann was not involved with him, was as "disconnected" as she would be in a visit with any friend. While she had responded when her father spoke to her, there was no warm greeting or hugging: "There wasn't the usual greeting I would have expected" from a child with a visiting parent. At other times when Fithian would ask if she had seen her father, there was little reaction, Mary Ann appearing "just not very interested" in speaking of him. The therapist recommended that CT Page 751 there be no further visits after adoption since the continuation of these visits had no benefit to the child who would suffer no detriment from their cessation. Given the possible alternatives, Fithian recommended adoption by the foster family as most favorable to the child; adoption by strangers as soon as possible if the foster family will not adopt as the second choice; indefinite continuation of her status quo as a foster child the third and least favored alternative. Since Mary Ann knows that adopted children are permanent but foster children can be removed, she presently feels that she is "in limbo" and does not know what will happen to her. Because of this, it would be more beneficial, if the foster family does not adopt, for her to be transitioned into a permanent adoptive home, assisted by renewed therapy, than to remain as a foster child any longer with the present foster parents.
After seeing father and daughter together in October, Fithian made an appointment to see Frank alone in November. He called to cancel, leaving a message and a telephone number. When Fithian called him back to reschedule, the phone was disconnected.
Psychiatrist Dr. Sadler saw Frank on only one of two scheduled appointments. On the first, he called after the time the first appointment was to begin to report "car trouble" but could not find a time to make up that interview. (State's Exhibit A, p. 2). While he displayed no thought disorder and related appropriately, he could not explain his multiple hospitalizations over the past 20 years, expressing his view that on all but one or two occasions, he was hospitalized against his will. (Id.) He stated that he felt his medication was too strong, he did not like it, but is willing to take it. Similarly, while he does not like therapy sessions and feels they are unnecessary, he was willing to attend. His thinking and judgment appeared most impaired in connection with his ex-wife and daughter, denying that Susan had ever suffered from mental illness or that Mary Ann had been sexually abused. Dr. Sadler concluded that Frank
 . . . appeared to be a chronically psychiatrically impaired man who is currently functioning in a generally stable and marginally adequate manner . . . [He] was unable to adequately explain his multiple hospitalizations or the need for his daughter's foster care. (Id., p. 5)
Dr. Sadler found Mary Ann to be a child with "major emotional and possibly neurological impairments" . . . which affect her ability to enter into interpersonal relationships and which CT Page 752 affect her thinking and her ability to express herself."
 These are major psychological problems for a child of this age, and there is a significant possibility that these difficulties will continue to be manifest for many years if not throughout Mary's entire life. (Id., p. 17)
Dr. Sadler found the father-daughter interaction "notable for its calm, mild mannered, pleasant, distant and emotionally disengaged manner." (Id., p. 8) While the child appeared comfortable emotionally and physically with her father, "There was no suggestion of an emotional history between the two." (Id.) He found Frank to be reasonably concerned about Mary Ann, ". . . yet he has demonstrated over a number of years a massive impairment in his ability to care for his daughter and no ability to provide a stable and appropriate environment for her." His relationship with the child is "pleasant, related and superficial." (Id., p. 10) While his influence on Mary Ann is not actively negative or detrimental, his "variability and lack of predictability has exerted a negative emotional influence upon Mary." (Id.) Dr. Sadler did not foresee any change in Frank or his relationship with Mary Ann in the future:
 [He] has a significant, serious and longstanding psychiatric impairment which has led him to require multiple hospitalizations [and] . . . which has been a consistent detrimental influence upon his social and occupational endeavors for approximately 20 years. Therapeutic efforts do not appear to exert more than a stabilizing influence upon [him] . . . rather than offering the potential of eliminating or gradually improving the impairments demonstrated . . . Therefore, [his] . . . prognosis is for continued psychiatric impairments at a level similar to that currently demonstrated. (Id., p. 11)
He concluded that Frank "is not now capable of minimally adequately meeting the emotional and physical needs of his daughter. I see no possibility that he will be able to develop the ability to adequately care for her in the future. Therefore, I see no possibility of a successful reunion between biological father and daughter.")Id., p. 12) While Dr. Sadler saw no specific negative influence on the child from her father's visit, in his opinion her permanent caretakers should have "full authority to encourage or prevent parental visits" since this "would increase the stability of Mary's relationship with them.: (Id.) While he had no opinion as to whether adoption should be by this foster family or by some other, he CT Page 753 recommended that Frank's legal authority over her be ended:
 . . . her perception of his diffuse and indeterminate control over the environment is significant to Mary's detriment . . . I believe that it is detrimental to Mary's emotional health and here sense of stability for her father to be able to make judgments concerning her placements or her day to day activities. (Id., p. 13)
In his testimony of November 5, 1990, Dr. Sadler reiterated his prediction that Frank could be unable to respond to Mary Ann's needs or protect her from further abuse since he denies she was abused in the past. Sadler testified that it was "very important" for the child's caretaker to be sensitive to these issues since she will have to "rework" the trauma she suffered as a child at every step of her development for the rest of her life. He termed it "abnormal" for a father who has maintained as much contact with a child as Frank has with Mary Ann to be so out of touch with her psychological needs. He, like Fithian, concluded that it would only be detrimental to the child for Frank's parental rights to continue. His pattern of irregular visitation was disrupting and confusing to the child, even though the visits themselves were conducted without incident, because of the signal they gave to her of the uncertainty of her placement. Sadler felt visitation should only continue if the uncertainty of where she was going to grow up could be ended and if her permanent caretakers agreed to such visits. Although Mary Ann had made some gains in the foster home, the impersonal manner in which she related to everyone was a prediction of troubled relationships in adolescence and adulthood, and presented special problems for anyone charged with her full time care. Due to his own impairment, Frank is less likely than others to be able to meet her special needs. Whether Mary Ann is to be adopted by the present foster family, by strangers, or remains an unadopted foster child, termination of Frank's parental rights was recommended since it is "crucial that she know she'll not be placed in his care again." The prospect of that, suggested by his visits, is "destabilizing" and "disruptive" for her.
Adjudication — on facts as of April 20, 1990 (father) and January 3, 1991 (mother)
Mother: Having been found to have been given voluntarily, knowingly and with the advice of counsel, Susan's consent to the termination of her parental rights is accepted as valid. By agreement of counsel for Susan and the petitioner, all of the nonconsensual grounds for terminating her parental rights are therefore dismissed without finding or prejudice. CT Page 754
Father: The petitioner has offered clear and convincing proof in support of two of the three nonconsensual grounds alleged for terminating his parental rights. The third — the denial by reason of acts of parental commission or omission, the care guidance or control necessary for the child's physical, educational, moral or emotional well-being — is dismissed in the absence of any evidence that the child has been denied such care, guidance of control at any time since her custody was assumed by DCYS in July of 1988.
(1) While Frank may have made some progress in his personal rehabilitation with regard to his own situation — he no longer lives in shelters but has an apartment; he has not been psychiatrically hospitalized in the nearly two years of Mary Ann's commitment to DCYS — there has been no rehabilitation vis-a-vis his ability to assume care of this child: He continues to deny that she was abused in the past or that she has special needs. He continues to be under psychiatric disability for the purposes of receiving SSI. He displays no understanding of the effects on the child of his erratic pattern of visitation. And, most significantly, he at no time has ever suggested that he is now, or ever expects to be, able to become Mary Ann's primary caretaker. All along he has expressed a continuing desire only to maintain his visitation rights, expressing from time to time his willingness to consent to termination of his parental rights if the subsequent adoption and/or visitation could be under his control. Since the independent evaluation which he secured was not offered into evidence, it is reasonable to infer that nothing in the report of the evaluator of his choosing would vary significantly from the recommendations of the child's therapist and the court-appointed psychiatrist. Nothing, therefore, in this record, encourages "the belief that within a reasonable time, considering the age and needs of the child, . . . [he] could assume a responsible position in the life of the child." This is sufficient proof of his failure to rehabilitate to constitute grounds to terminate his parental rights.
(2) Both Fithian and Sadler came to the same conclusions with regard to the interaction between Frank and his daughter: It was friendly, calm, pleasant — the interaction that the child would be expected to have with a visiting adult friend. Mary Ann is indifferent to his visits unless he brings food, but is disturbed and upset when visits are scheduled and he fails to appear. Nothing in their interaction suggested to either clinician an "ongoing parent-child relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child" and, considering Frank's psychiatric disability and his expressed desire to continue visitation only CT Page 755 and not to assume her care, it is clear that "to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." Both Fithian and Sadler were unequivocal and uncontradicted in their recommendation that parental rights be terminated to permit Mary Ann the opportunity to know the security of a permanent, nurturing placement. Continuation of visitation is of no particular benefit to the child and would be detrimental unless it is continued after a permanent placement has been assured to the child AND it is endorsed by her permanent caretakers.
Disposition — on facts as of December 3, 1990
Having found grounds to terminate the parental rights of each parent, the court is required to consider the six factors set forth in subsection (d) of Sec. 17-43a with regard to the nonconsenting parent:
(1) The only service that could be offered to Frank to facilitate reunion with his daughter was permission to visit. From being a parent whose whereabouts were unknown (at the time the original neglect petition was filed in July of 1988) and who failed to appear in court at the time of commitment (in January of 1989), Frank became the parent who visited most consistently during the child's commitment. He was permitted to make his own visitation arrangements, and did so with fair regularity for the first six months of Mary Ann's commitment. In June of 1989, as a result of the frequency of his visits, he was permitted for the first time to have visits that were not supervised by the foster parents. A month later, in July of 1989, he stopped visiting regularly, and in the ensuing nine months (between July 23, 1989 and the filing of the instant petition on April 20, 1990 he visited only twice. He refused to inform DCYS of his own counselling situation, maintaining it had nothing to do with his daughter. In the absence of any proposal to be reunified with his child, no other services were required.
(2) In 1988 the court ordered Frank to be evaluated by Dr. Sadler, and he failed to appear for the scheduled appointment. In 1990 the same order was issued. Frank kept one of two scheduled appointments, and although offered a number of dates and times to reschedule the missed appointment, he could not make himself available for any of them, giving no reasons for his unavailability. No expectations were spelled out for Frank, as they were for Susan, at the time of Mary Ann's commitment to DCYS in 1989 because he failed to appear in court on that occasion. CT Page 756
(3) The feelings and emotional ties of Mary Ann for her father and her foster family were thoroughly explored by the state's two clinical witnesses: There is no hint of a parent-child relationship between father and daughter, Mary Ann regarding his visits as those of a friend who brings food but are otherwise a matter of indifference. Marilyn Fithian found Mary Ann strongly bonded to her foster parents, although Dr. Sadler found her ability to attach to them impaired by the early childhood traumas she suffered.
(4) Mary Ann, at seven and a half, has spent a third of her life in foster care. The impermanence of her situation is keenly appreciated by the child. Her need for permanency without further delay is critical.
(5) While Frank has apparently made efforts to adjust his circumstances, conduct of conditions to keep himself out of psychiatric hospitalization — by securing a stable income through SSI; by locating an apartment for himself; by complying with his psychiatric treatment, albeit reluctantly — he has done nothing "to make it in the best interest of the child to return . . . [her] to his home in the foreseeable future." He has maintained contact with the child, but erratically, ceasing regular visitation just when permitted unsupervised visits, and recommencing frequent visitation only when this litigation was pending.
(6) Nothing has prevented Frank from maintaining a meaningful relationship with his daughter. The nature of his interaction with her during the visits that did take place precluded the development of a relationship that was meaningful to the child. The cessation of regular visits between July of 1989 and May of 1990 was not dictated by DCYS but was a decision made, for reasons that are unclear from this record, by the father himself. When visits did resume during the pendency of this case, the return to supervised visitation and the eventual limitation to once per month was not unreasonable considering the four scheduled visits for which he failed to appear and the possibility that should the relief sought be granted, all visitation (save that permitted by the child's daily caretaker) might cease.
Having considered the foregoing and the clear recommendations of both the court-appointed psychiatrist and the child's longtime therapist, it is found by clear and convincing evidence to be in the child's best interests for Frank's parental rights to be terminated so that the child might know the security of a permanent placement without the possibility of return to his care. Since such security may not be obtained by terminating the rights of only one parent, it is CT Page 757 also found by clear and convincing evidence that it is in the best interests of this child for her mother's parental rights also to be terminated.
Therefore, it is ORDERED that the parental rights of Susan and Frank F. in and to their daughter Mary Ann F., be, and hereby are, terminated. It is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing the child in a secure and permanent placement, and that such Commissioner shall submit a report as to the implementation of this plan, pursuant to subsection (i) of Sec. 17-43a no later than 90 days from the date of this judgment, and thereafter at such intervals and in such form as this court may from time to time require. It is further ORDERED that if the child has not been placed in finalized adoption on or before May 1, 1992, the said Commissioner shall file with this court a Motion To Review Plan for Terminated Child to be in compliance with the requirements of federal law.
Appeal
The father has 20 days from the date of this judgment in which to seek an appeal. If, after being informed by trial counsel of the court's judgment and the right to take an appeal, he affirmatively manifests a desire to do so, if such trial counsel is willing to act in that capacity, the court will appoint him for this purpose. If the respondent manifests a desire to take an appeal, and if trial counsel declines to represent the father because in his professional opinion it lacks merit, such attorney is not required to do so but may file a timely motion to withdraw and to extend time in which to take an appeal. The court will then appoint another attorney to review this record who will, if willing to represent the parent on appeal, be appointed for this purpose. If the second attorney determines that there is no merit to an appeal, he or she is requested to make this known to the court at the earliest possible moment, and the respondent parent will be informed by the clerk forthwith of the balance of the extended appeal period in which to secure his own counsel, who, if qualified, may be appointed to represent the respondent parent on the appeal. If this is not done, then upon expiration of the extended appeal period, the right to pursue an appeal will be ended and the termination of parental rights final. The child will at that time, and not before, be free to be placed in adoption.
If such procedures satisfy the sixth amendment right to counsel in criminal cases (Douglas v. California, 372 U.S. 353
(1963); Fredericks v. Reincke, 152 Conn. 501 (1965)), they are even more appropriate where there are interests of a third CT Page 758 party involved: Those of the child whose need for permanent, safe parenting is entitled to at least as great a degree of consideration as are those of the parent whose right to raise her is at issue. Even unsuccessful appeals delay permanent planning for years since no child may be adopted until the appellate process is exhausted. The need for finality of judgment in cases where the state initiates legal action against indigent respondents, which gave rise to the rule of Douglas and Fredericks, supra, applies as much or more to cases where the person affected by the judgment is a young child for whom the passage of periods of time that may seem short for adults can work changes with lifetime implications.
Entered at Hartford this 17th day of January, 1991.
BRENNEMAN, J.